Fabricant, J.
INTRODUCTION
This action presents a dispute between parties to the sale of a landfill business regarding royalty payments from the present owner of the business to the former owner. Agreeing that at least the first count of the complaint presents only an issue of contract inter *293 pretation. to be decided by the Court as a matter of law based on the contract documents and undisputed facts regarding the circumstances surrounding the transaction, the parties have submitted cross-motions for summary judgment. For the reasons that will be explained, the Court concludes that the plaintiffs interpretation is correct, and accordingly will allow the plaintiffs motion for partial summary judgment and deny the defendants’ motion.
BACKGROUND
From 1983 to 1986, Edward J. Reddish was the sole shareholder in Northern Disposal, Inc. (“NDI”). which operated a landfill in East Bridgewater. In 1986 Reddish sold all of his stock in NDI to Browning-Ferris Industries, Inc. (“BFI”), which then took over operation of the landfill. The parties to the transaction entered into three separate agreements: a Purchase Agreement, dated June 27, 1986; an Additional Payment Agreement (“APA”) dated July 25, 1986; and a Consultant Agreement also dated July 25, 1986 and amended March 27, 1988. Provisions of these agreements pertinent to the present dispute are the following.
The Purchase Agreement provides, in section 1.1, that the purchase price to be paid by BFI to Reddish will be twelve million dollars, subject to certain adjustments, plus “additional payments” to be made in accordance with the APA. The APA provides, in section 3.1, that BFI will pay Reddish $3.05 “for each ton of solid waste disposed of in the Landfill,” subject to a single exception, not relevant here, and a specified minimum, commencing one year after the agreement, and ending when payments have reached $2,500,000, or when “the Landfill is completely filled and rendered unusable, whichever first occurs.” Section 2.11 of the APA defines “solid waste” as “any garbage, refuse, trash, and rubbish or other waste which may lawfully be disposed of in the landfill.” The Consultant Agreement provides, in section 1, that for a period of ten years Reddish will “consult, advise and assist the Company” in obtaining approvals for “expansion, vertically or horizontally” of the landfill. Under section 3(a) of the consulting agreement, if such approvals are obtained, and if Reddish “has used his best efforts” to obtain such approvals, then he is to be compensated thereafter by payment of a “consulting fee” in the amount of either $7.50 or $3.05, depending on the type of expansion approved, “for each ton of solid waste disposed of in the Landfill. ” The March 31, 1988 amendment to the Consulting Agreement provides for payment of such consultant fees also upon approval of increased daily tonnage limits. Both the APA and the consultant agreement require BFI to “comply with all federal and state laws applicable to the operation of the landfill.”
The Landfill paid Reddish at the rate of $3.05 per ton from 1987 until January 15, 1991. It obtained approval for vertical expansion as of that date, with Reddish’s assistance, and thereafter paid Reddish at the rate of $7.50 per ton, until it closed in February of 1997. Between April of 1987 and February of 1997, BFI paid Reddish a total of $18,238,110 in royalties under the agreements, in addition to the initial twelve million dollar purchase price. BFI total gross revenue from operation of the landfill between its purchase and February of 1987 was $169,524.342.
At the time of these agreements, and continuing to the present, the operation of landfills in Massachusetts has been subject to extensive regulation. All parties to the transaction were familiar with the applicable regulatory schemes. Among the regulatory systems in effect at the time was a set of regulations promulgated in 1971 by the state agency then known as the Department of Environmental Quality Engineering, now the Department of Environmental Protection (DEP). Certain terms that appear in the agreements were at the time defined terms in the 1971 DEP regulations. Pertinent regulatory definitions, in effect at the time, included the following:
Refuse. Putrescible or non-putrescible solid waste materials, consisting of all combustible and noncombustible solid wastes including garbage and rubbish, but not including sewerage . . .
Rubbish. Combustible or non-combustible solid waste material, except garbage and sewage . . .
Sanitary Landfill. A method of disposing of solid wastes on land in such a manner as will protect the public health . . .
Solid Wastes. Any unwanted or discarded solid material. . .
Waste. Useless, unwanted or discarded solid, liquid or gaseous materials resulting from community, domestic, commercial, agricultural and industrial activities.
310 C.M.R. §19.01 (12)-( 15), (17) (1971).
The 1971 DEP regulations included a requirement that each landfill be operated in such a manner as “to cover it with a layer of material at the end of each day’s operation or at more frequent intervals as may be necessary.” 310 C.M.R. §19.01(17) (1971). The regulations required placement of “at least six inches of uniformly compacted cover material on all exposed refuse before the end of each working day.” 310 C.M.R. §19.15(1) (1971). “’’Cover" was defined as “(l)ayer or layers of material placed over refuse for vector and fire control, aesthetics, prevention of odors and percolation of water, grading, support of vegetation and other purposes.” 310 C.M.R. §19.01(4) (1971).[1]
During Reddish’s ownership, NDI’s practice was to use “clean” soil or soil-like materials as daily cover. The landfill at times bought these cover materials, and at other times received them without any payment either way. Thus, cover was at times an expense, and at other times cost-neutral, but never a source of revenue for the landfill under Reddish’s operation.
*294 Between 1987 and 1994, DEP adopted new policies encouraging the use as cover at landfills of certain mildly contaminated materials that had previously been ineligible for such use.[2] Among these were soils containing a small proportion of petroleum contamination, as well as materials referred to as “auto shredder residue fine,” “construction and demolition fine,” “paper ash,” and “street sweepings.”[3] DEP explained its policy change in a 1988 document as follows:
Use of contaminated soil as daily cover is encouraged because such practice avoids unnecessary consumption of valuable disposal capacity, saves landfill operators the expense of obtaining daily cover, and, to a limited extent, provides treatment for the contaminated soil.
As a result of this regulatory change, the landfill was able to meet the cover requirement in part by accepting materials that other businesses were willing to pay to get rid of, albeit at a rate substantially less than the landfill's customers paid for disposal of non-cover materials. Cover thus became a source of revenue for the landfill under BFI operation, rather than a cost. Between 1988 and 1997 BFI received payment in the total amount of $8,601,101 for 781,020 tons of “revenue cover” — that is, material it was paid to accept, that it used as cover.[4]
In calculating royalty payments due to Reddish under the agreements, BFI did not include “revenue cover.” The difference between the amount paid Reddish and the amount due if these materials are included in the calculation, at the same rate per ton as specified in the agreements, is $5,179,425.[5] Reddish alleges, in count I of his complaint, that BFI’s failure to pay him royalties on “revenue cover” was in breach of contract. Additional counts of the complaint allege breach of contractual provisions requiring BFI to provide him access to its records (count II); unjust enrichment (count III); breach of the implied covenant of good faith and fair dealing (count IV); fraudulent and negligent misrepresentation, based on the failure to disclose to him the receipt of payment for materials used as cover and the exclusion of such materials from calculation of his royalty payments (counts V and VI); and violation of G.L.c. 93A by virtue of the conduct alleged in the other counts (count VII). Defendants now move for summary judgment on all counts of the complaint. Reddish has cross-moved for summary judgment on all counts other than the c. 93A claim.
DISCUSSION
Summary judgment should be granted where it appears from the pleadings and evidentiary materials offered that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 426 (1995); Cassesso v. Commr of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). Summary judgment is a device “to make possible the prompt disposition of controversies on their merits without a trial, if in essence, there is no real dispute as to the salient facts or if only a question of law is involved.” Dawes, 369 Mass. at 554.
Here, the parties agree that the issue of contract interpretation presented by count I of Reddish’s complaint raises only a question of law, to be decided based on the contract terms, in light of undisputed facts regarding the surrounding circumstances. Although the parties advance contrary interpretations, and both sides make reference to certain deposition testimony and other extrinsic sources, neither contends that the contract is ambiguous or that its interpretation depends on any disputed facts. Accordingly resolution of count I on summary judgment is appropriate.
The basic principles of law governing contract interpretation are well settled, and are not in dispute. The Court must consider “the particular language used against the background of other indicia of the parties’ intention,” and must “construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished . . . Not only must due weight be accorded to the immediate context, but no part of the contract is to be disregarded.” Starr v. Fordham, 420 Mass. 178, 190 (1995) (citations omitted). Further, a contract “should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties.” Id. at 192, citing Shane v. Winter Hill Fed Sav. & Loan Ass’n, 397 Mass. 479, 483 (1986). The principal guide to contract interpretation is, of course, the language of the contract itself “Words that are plain and free from ambiguity must be construed in their usual and ordinary sense.” Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998); Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. at 427.
Here, the context and background of the contract, against which its terms must be construed, includes the following undisputed facts: The parties entered into a transaction for the purchase and sale of a landfill. Landfill operation was heavily regulated, as the parties well knew. The business of a landfill was to dispose of waste — that is, to receive material for which other businesses had no use. The receipt of such materials was the landfill’s only function, and customers' payments for disposal of those materials were its only source of revenue. Thus, provision in the agreements for payment per ton of “waste disposed of in the landfill” was, in practical effect, provision for payment of a portion of all revenue received by the landfill; no revenue stream existed other than by virtue of tons of waste disposed of.
The operation of a landfill, like that of any other business, had certain costs. Among these costs, as of the time of the transaction, was the price of purchasing materials to be applied as cover, in compliance with regulatory requirements. The materials purchased for *295 that purpose — generally clean soil — had other uses, and therefore had market value; such materials could not fairly be characterized as waste under any reasonable definition. Cover materials were sometimes available free of charge, presumably for reasons having to do with the market value of such materials in relation to the costs of storage and/or transportation. But as of the time of the transaction cover materials had never been a source of revenue, because regulatory authorities had never allowed the use as cover of any materials that customers would pay to dispose of. Thus, as of the time of the transaction, waste and cover were two completely different things, and no prospect existed of any overlap between them. The parties therefore had no occasion to, and did not, say anything in the contract about cover, and in particular did not say whether cover could ever be waste for purposes of royally payments.
What gives rise to this dispute is that, contrary to the assumptions on which the parties entered into the contract, regulatory changes have produced overlap between cover and waste. DEP's current policy allows the use as cover of materials that, from the point of view of their source, are indisputably waste, in the sense that they are so useless and burdensome that the source is willing to pay for their disposal. From the point of view of the landfill, however, these materials have characteristics both of waste and of necessary supplies; the landfill is paid to receive them, just as it is paid to receive any waste, although at a lower rate than other types, but it is also able to put them to positive use, substituting them for materials that it would otherwise have to purchase. If anything is clear on the facts presented, it is that the parties simply did not contemplate or provide for this development. Nevertheless, in light of both sides’ positions that the contract is unambiguous, the Court must apply it according to its terms.
The operative language of the contract is that Reddish is to receive a royalty payment for “each ton of solid waste disposed of in the landfill.” The contract definition of “solid waste” as “any garbage, refuse, trash, and rubbish or other waste which may lawfully be disposed of in the landfill” is as broad as any drafter could be expected to devise; it is difficult to imagine words that could have been employed to expand its scope. Moreover, the parties agreed to the use of these words in the context of their familiarity with the 1971 DEP regulations, which defined these terms so broadly as to encompass anything “useless, unwanted or discarded.” The regulatory definitions, by their nature and language, adopt the perspective of the source of the materials. It is nonsensical to say that something is unwanted from the point of a landfill operator, whose revenue depends on whether the customer wants the material, or wants instead its disposal; it is inherent in the nature of the landfill business that the landfill operator wants to receive whatever its customers are willing to pay to dispose of. Thus, the contract definition of waste, for the disposal of which royalties are due, must be understood to include everything for the acceptance of which the landfill receives payment.
BFI argues that cover cannot be waste, because DEP regulations require that cover be put over waste; if cover is waste, it reasons, then the placement of such cover leaves waste exposed, in violation of regulations. BFI relies for this theory, in particular, on language in the current DEP regulations, enacted in 1994, providing that a determination by DEP that a certain material has a beneficial use as cover “means that the material is not classified as a solid waste . . . when used in accordance with the Department’s determination of beneficial use.” 310 C.M.R. §19.060(5) (1994). The issue here, however, is not whether these materials are “classified as” waste under the current DEP regulations, but whether they are waste for purposes of the agreement between these private parties — that is, whether they are within the category of materials that these parties described by the use of that word. Although the regulatory definitions that were in effect at the time of the agreement may be considered as part of the context in which the parties chose their language, nothing in the agreements suggests any intention of the parties to incorporate subsequent changes in regulatory classifications.
Indeed, the regulatory language cited tends to confirm that the material is waste as that term is commonly understood; DEP exempts it from that classification not in any general sense, but only under specified circumstances involving the issuance of a particularized determination. Overall, DEP’s current regulatory scheme, when described in plain language, involves the designation of two distinct categories of waste, based on levels of contamination. Both categories are waste in the sense that their sources need to dispose of them, and pay to do so, and DEP regulates their disposal. But DEP has determined that their environmental characteristics are sufficiently different to warrant different treatment, with one category so dirty as to need cover, and the other sufficiently clean that it can be used as cover, eliminating the need for clean, marketable material to fill that role. That DEP now labels the latter as something other than waste under certain specified circumstances does not affect the meaning of the words used in the agreement.
The contract does not define “disposed of’ The parties invoke customary landfill operations at the time as a source of definition, but reach opposite conclusions. BFI points to the requirement that cover be placed over waste as indicating that “disposed of’ must have meant buried under cover, and therefore could not have been meant to include placement in the landfill as cover.[6] As discussed, supra, however, in the regulatory context in which the agreements were executed, material that landfill customers needed to dispose of was ineligible for use as cover, and therefore *296 could not end up anywhere in a landfill other than under the cover. The change in regulatory policy has changed the location in the landfill where such material may be placed, but not the purpose for which its sources send it to the landfill. From the point of view of its source, the material is “disposed of’ in the landfill, regardless of where in the landfill it is placed, or whether it benefits the landfill operator in some way beyond the payment received for its disposal.
In light of the context of the agreement and the unambiguous words employed, construed according to their usual and ordinary sense, the Court concludes that material sent to the landfill by sources seeking to dispose of the material, which the landfill is paid to accept, is “solid waste disposed of in the landfill” within the meaning of the agreement, regardless of its use as cover. Accordingly, Reddish was entitled to royalty payments on such materials. BFI points out that this interpretation entitles Reddish to payment of a disproportionate share of revenue received from cover material, as compared with his share of other waste disposed of in the landfill. This conclusion appears to be consistent with the facts presented, although its economic significance to the parties is not fully apparent without information that has not been provided as to the cost savings through the use of revenue cover. In any event, this result, if it exists, is a function of the agreement itself, which sets a fixed rate per ton, rather than a percentage of revenue or profit. The Court is not empowered to rewrite the agreement so as to ensure a result that the parties, or the Court, might view as fair. It is worth noting, moreover, that as between these parties, if either had any ability to influence the amount of material accepted as revenue cover or the revenue received for such material, it was BFI, not Reddish.
BFI’s final argument is that Reddish is not entitled to royalties on revenue cover because he did not participate in efforts to secure regulatory approval for the use of such materials as cover. Characterizing the regulatory changes that permit the use of alternative cover materials as effectively allowing the landfill to increase its daily tonnage, BFI points to the provision in the amendment to the Consultant Agreement for payment of consultant fees upon approval of increased daily tonnage limits, provided that Reddish has used his best efforts to obtain such approval. The amended agreement, however, provides for payment of consulting fees as specified upon approval of any of several types of expansion; the types of expansion are in the disjunctive. It is undisputed that the landfill obtained approval for vertical expansion in 1991, with assistance from Reddish, and that it thereafter paid Reddish under the Consultant Agreement at the rate triggered by that expansion. BFI thus acknowledged by its own conduct that Reddish had met the “best efforts” requirement, and was entitled to payments at the higher rate on each ton of waste disposed of at the landfill thereafter. He is therefore entitled to judgment as a matter of law on count I of his complaint.
Reddish’s motion also seeks summary judgment on counts II through VI of the complaint, that is. all counts other than the c. 93A claim. His factual showing, however, presents little information about the factual basis for those claims, beyond the breach of contract alleged in count I, and the additional allegation, apparently undisputed, that BFI did not disclose to him that it was using as cover materials for which it received revenue. He offers nothing to show that he suffered any damages from the conduct alleged in those counts in addition to the damages, undisputed in amount, resulting from the breach of contract alleged in count I. BFI’s opposition as to those counts rests entirely on its arguments on the contract interpretation issue presented in count I; its materials do not indicate whether, if those arguments fail, it contests the factual or legal basis for the other counts. Thus, neither side has demonstrated that it is entitled to judgment as a matter of law on counts II through VI, and summary judgment is not warranted as to those counts at this time.
CONCLUSION AND ORDER
For all of the foregoing reasons, Defendants’ Motion for Summary Judgment is DENIED. The Plaintiffs Motion for Partial Summary Judgment is ALLOWED as to Count I and otherwise DENIED.

DEP revised its regulations in 1994. The current version employs somewhat different wording, but the corresponding provisions are substantively similar. If either version bears on interpretation of the contract documents, it is the 1971 version, which was hi effect at the tune of the contract.

Reddish asserts that BFI “was instrumental in pushing the DEP to adopt these policies.” BFI neither adopts nor disputes that characterization.

Although the parties' submissions provide varying definitions of some of these terms and descriptions of the physical nature of the materials, neither side suggests that any disagreement over their description is a genuine dispute of material fact precluding resolution of the contract interpretation issue on summary judgment. For present purposes, it suffices to note that “fine” refers to finely ground residue remaining after recycling or other industrial or commercial processes.

The parties have stipulated to the number of tons and the amounts of revenue received of cover and non-cover materials during these years. The figures provided indicate that payments for BFI acceptance of material to be used as cover averaged $10.32 per ton, as compared with an average of $47.45 per ton for non-cover materials.

BFI points out that, based on the same stipulated figures as to tonnage and revenue received, this amounts to some 64.5 percent of the total revenue BFI received for materials used as cover, compared to Reddish's royalties of some 11.3 of revenue received by BFI for other materials disposed of in the landfill. BFI does not offer information as to its savings on the purchase of the clean materials previously used as cover.

BFI notes deposition testimony of Reddish consistent with this definition, to which Reddish responds by pointing out other portions of his deposition testimony that support a contrary interpretation. Since neither side argues that the contract is ambiguous, no such testimony can be considered.